IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) Criminal No. 20-118 |
| | ) Senior Judge Nora Barry Fischer |
| WILLIAM JACKSON, | ) |
| | ) |
| Defendant. | ) |

**MEMORANDUM OPINION**

I.     **INTRODUCTION**

Defendant William P. Jackson ("Defendant") was charged by Indictment on June 9, 2020 with three counts of transmitting a threat in interstate commerce, each in violation of 18 U.S.C. § 875(c). (Docket No. 1). On January 24, 2022, Defendant pled guilty to Count 2 of the Indictment, i.e., he admitted that he made a telephone call to an individual and threatened to kill that individual's children. (Docket No. 124, Ex. A, ¶ A.1). He also acknowledged responsibility for the criminal conduct at Counts 1 & 3 of the Indictment, namely threatening to kill his ex-girlfriend and her parents in text messages and/or a phone call. (Docket No. 124, Ex. A, ¶ A.2).

Presently before the Court is a dispute surrounding the sufficiency of the evidence supporting the Probation Office's assessment of a six-level enhancement under Guideline § 2A6.1(b)(1) for "conduct evidencing an intent to carry out such threat." (*See* Docket No. 147). Defendant disputes the application of the enhancement, and has lodged an objection thereto. (Docket No. 165). The Government contends that the Probation Office appropriately applied the six-point enhancement under the facts of this case. (Docket No. 166).

The Court held an evidentiary hearing over the span of three days, on February 14, 18, and 22, 2022, at which time the parties presented evidence in support of their respective positions. The Court has obtained and reviewed the transcripts from these proceedings. (Docket Nos. 153-155).

1

After careful consideration of the parties' arguments, as well as thorough review of the exhibits and transcripts from the evidentiary hearing, and for the following reasons, the Court believes that the enhancement applies.

## II. BACKGROUND

At the evidentiary hearing, the Government called a single witness, Sergeant Gary James ("Sgt. James") of the Bridgeville Police Department. (*See* Docket Nos. 153-154). It also introduced a number of exhibits, including: Protection From Abuse "PFA" Orders that the victim, M.O. ("M.O."), had previously obtained against the Defendant in the past; documents allegedly demonstrating that Defendant has threatened and harassed M.O. in the past; transcripts from prior proceedings; a victim impact statement; text messages and call logs from the night in question; police incident reports and dispatch records relating to this matter; video surveillance footage showing a portion of the dispute between Defendant and M.O.; and, photos of the damage Defendant caused to M.O's home. (*See* Docket No. 140, Gov't Exs. A-Q). Defendant testified on his own behalf, (*See* Docket No. 155), and the defense introduced a number of his own exhibits, including a map showing relevant locations; a past written statement from M.O.; a photo of Defendant and M.O. together in July of 2019; police reports from this incident; and, a single photo of a phone showing Defendant's address. (*See* Def. Exs. 1-6).

In this Court's opinion, Sgt. James offered credible testimony concerning the investigation of Defendant. *See United States v. Garcia,* 521 F. App'x 71, 73 (3d Cir. 2013) (quoting *Anderson v. City of Bessemer,* 470 U.S. 564, 574 (1985)) ("'[w]hen findings are based on determinations regarding the credibility of witnesses ... for only the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said.'"). He also presented as an experienced law enforcement officer who explained that

he has served in the Bridgeville Borough Police Department for 32 years. (Docket No. 153 at 16). The Court further found that Defendant was credible to the extent that he admitted much of the events in question. *See Garcia*, 521 F. App'x at 73. While the parties disputed many of the facts, the Court finds that the undisputed facts, as admitted by Defendant during his own testimony and the uncontested exhibits, are sufficient to apply the 6-level enhancement. The Court's summary of the events focuses on those uncontested matters.

The charges in the present case arose from Defendant's conduct during the night of August 2, 2019 and the early morning hours of August 3, 2019. At that time, Defendant was the subject of a 2018 PFA which prevented him from having contact with his ex-girlfriend, M.O., as well as her three children, until its expiration on November 27, 2021. (*See* Docket No. 140 at Gov't Ex. C). The PFA also excluded Defendant from the premises of M.O.'s home at 178 Pennsylvania Ave., Bridgeville, PA 15017 through the same date. (*Id.*). It is uncontested that Defendant was previously the subject of a PFA filed by M.O. in 2015, and that he was convicted of harassment and stalking of M.O. in state court in 2015 and 2017 after violating the PFA by threatening M.O. and her family members, among other things, for which he served time in prison. (Docket Nos. 147 at ¶¶ 99-101; 153 at 25-32). He was also on state probation at the time of this episode. (Docket No. 153 at 32).

Despite these restrictions, Defendant began contacting M.O. in July of 2019 to offer her money and gifts after he had obtained roughly $175,000 from a burglary to which he later pled guilty in the Court of Common Pleas of Allegheny County. (Docket No. 155 at 36). In July of 2019, Defendant was living in Ross Township, but met M.O. multiple times during this time frame in Bridgeville and/or Carnegie, which are approximately 15-20 miles away from his own home. (*Id.* at 33). On August 2, 2019, Defendant again planned to meet M.O. in Bridgeville in order to

get his wallet back from her, along with roughly $10,000 of the burglary proceeds which were contained therein. (*Id.* at 39-40).

Defendant arrived in Bridgeville at approximately 9:00 p.m. and began drinking at Burg's bar while he waited to hear from M.O. (*Id.* at 44). At 10:04 p.m., Defendant initiated contact with M.O. from a new cell phone number, because he had lost his old phone while riding his motorcycle. (*Id.* at 43-45). In the ensuing minutes, Defendant and M.O. exchanged a series of text messages and phone calls, including several missed/unanswered calls. (*See* Docket No. 140 at Gov't Ex. H). At 10:11 p.m., Defendant texted "I am on we at to hospital," which he admits was likely a reference to making a scene at St. Clair Hospital, where M.O. worked, in order to goad her into responding to him. (Docket No. 155 at 46-47). At some point during one of their phone conversations, M.O. told Defendant that she was at the Crafty Jackelope bar in Bridgeville with her friend. (*Id.* at 48). At 10:19 p.m., Defendant makes his first threat, which was the subject of Count I of the Indictment, when he texted "Are you kidding me I am on way there it y our sitting with as dude as am fucking you up." (Docket Nos. 153 at 42-43; 155 at 48; 140 at Gov't Ex. H).

A short while later, after a few additional unanswered text messages and outgoing calls, Defendant texts M.O. at 10:32 p.m. "I'll meet you at house." (*See* Docket No. 140 at Gov't Ex. H). He testified that he did, in fact, go to M.O.'s home at that time, and he estimates that he arrived shortly before 11:00 p.m.[1] (Docket No. 155 at 50). He admits that he went there and caused damage to the property because he was frustrated with her. (*Id.* at 51). In total, Defendant broke the glass of one window, forced another window off the tracks, kicked in the screen door, knocked over a potted plant, and broke a security sign. (Docket Nos. 154 at 29; 155 at 51; 140 at Gov't Ex. N). He

---

[1] The parties vehemently dispute the timing of Defendant's arrival at M.O.'s home, as discussed *infra*.

4

estimates that he left M.O.'s residence at 11:05 p.m. and went straight to the Crafty Jackalope to confront M.O. (Docket No. 155 at 51).

Security footage from in front of the Crafty Jackalope shows Defendant arriving on his motorcycle at 11:10 p.m. (Docket Nos. 153 at 45; 140 at Gov't Ex. I). The parties did not present any video evidence from inside the bar, but Defendant testified that M.O. was with another man when he went inside. (Docket No. 155 at 21, 48). Defendant claims that he told M.O. that he wanted his money, and immediately left the bar. (*Id.* at 53). M.O. followed him out, and the two appear back on the security camera footage in front of the bar at approximately 11:11 p.m. (Docket No. 140, at Gov't Ex. I). The two argue in the street, at which time he takes the glasses from M.O.'s face and throws them to the ground. (Docket Nos. 155 at 22, 55; 140 at Gov't Ex. I). Defendant leaves on his motorcycle, and a license plate reader confirms that Defendant merged onto the I-79 ramp to leave Bridgeville at 11:13 p.m. (Docket No. 153 at 37).

M.O. called the police at 11:14 p.m., and Bridgeville officers responded to the Crafty Jackalope. (Docket No. 154 at 22). The officers arrived at the bar at 11:20 p.m. and left at 11:55 p.m., during which time they overheard Defendant call M.O. twice, once threatening to "kill one of her kids," and the second time threatening to "get her parents." (*Id.* at 23-24). Defendant's phone records confirm that he called M.O. four times between 11:31 p.m. and 11:41 p.m., while she was with the Bridgeville police. (Docket No. 140 at Gov't Ex. H). Those threats were the subject of Counts II and III of the Indictment.

The Government submits an alternative timeline of events wherein the Defendant went to M.O.'s home and damaged her property <u>after</u> their dispute at the Crafty Jackalope, rather than beforehand. Despite the evidence from the plate reader which indicates that Defendant merged onto I-79 after leaving the Crafty Jackalope on the night in question, the Government contends

that it is entirely possible that he got off of I-79 at the next exit and returned to Bridgeville to damage M.O.'s home after making his threats. In support of this chronology, the Government relies upon a statement that M.O.'s daughter gave to the police, namely that she heard someone, whom she presumed to be Jackson, pounding on the front door of M.O.'s home at 12:30 a.m. on August 3, 2019, though she did not answer the door at that time. (Docket No. 140 at Gov't Ex. F). The damage to the home was noticed a few hours later, at approximately 2:00 a.m., when M.O.'s mother arrived at the residence. (*Id.*). The police were called at that time. (*Id.*).

During their ensuing investigation, the police canvassed the neighborhood on August 3, and three individuals reported hearing a loud motorcycle sometime around 11:30 p.m. on the night of August 2, 2019. (*Id.*). A fourth individual was interviewed on August 4, 2019, and reported that she saw and heard the motorcycle after 11:00 p.m. but before 11:30 p.m. on the night in question. (*Id.*). This individual also observed a man matching Defendant's description run from the porch of M.O.'s home, excessively "rev" the engine of the motorcycle, and leave the area quickly. (*Id.*). During his testimony, Sgt. James indicated that he could not say with any certainty whether Defendant vandalized M.O.'s residence before or after their encounter at the Crafty Jackalope, and that both scenarios were plausible. (Docket No. 154 at 35-36).

### III.  LEGAL STANDARD

The Court is tasked with weighing the credibility of the evidence presented by the parties at sentencing. *United States v. Perez*, 386 F. App'x 301, 304 (3d Cir. 2010) (citations omitted). The resolution of factual disputes is governed by the preponderance of the evidence standard. *See United States v. Fisher*, 502 F.3d 293, 304-05 (3d Cir. 2007); see also U.S.S.G § 6A1.3, comm. n. ("use of a preponderance of the evidence standard is appropriate to meet due process requirements and policy concerns in resolving disputes regarding application of guidelines to the facts of a

case."). Further, "[i]n resolving any dispute concerning a factor important to the sentencing determination, the court may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy." U.S.S.G. § 6A1.3(a).

### IV. DISCUSSION

Sentencing Guideline § 2A6.1(b)(1) provides for a six-level enhancement "[i]f the offense involved any conduct evidencing an intent to carry out such threat." U.S.S.G. § 2A6.1(b)(1). The commentary notes further explain that, when deciding whether the enhancement applies, "the court shall consider both conduct that occurred prior to the offense and conduct that occurred during the offense; however, conduct that occurred prior to the offense must be substantially and directly connected to the offense, under the facts of the case taken as a whole." *Id.* at n.1. For the six-level enhancement to apply, the U.S. Court of Appeals for the Third Circuit requires the defendant to have engaged in an overt act. *United States v. Brodie*, 824 F.App'x. 117, 121 (3d Cir. 2020) (unpublished) (citing *United States v. Green*, 25 F.3d 206, 211 (3d Cir. 1994)).

In the present case, Defendant relies upon the evidence from the license plate reader, which he claims shows him leaving Bridgeville after confronting M.O. at the Crafty Jackalope, in support of his position that he did not have the intent to carry out his threats. From his point of view, the fact that he did not remain in Bridgeville at the time he made his threats shows that his threats were hollow verbalizations of his frustration with M.O. rather than legitimate threats he intended to act upon. On the other hand, as previously noted, the Government does not agree that Defendant left the area following the altercation at the Crafty Jackalope, and takes the position that he went to M.O.'s home and damaged her property <u>after</u> making the threats, thus demonstrating his intent to carry out the same. The Government also contends that Defendant's history of violating the PFA

and threatening M.O. shows that he had the intent to carry out his threats on this occasion, along with his conduct at the Crafty Jackalope that night.

At the outset, the Court agrees with Sgt. James's assessment that either chronology advanced by the parties is plausible under the facts before the Court. (Docket No. 154 at 35-36). According to Defendant, M.O.'s home and the Crafty Jackalope are approximately 1 – 1 ¼ miles apart, and it took him "maybe two minutes" to go from one location to the other on his motorcycle. (*Id.* at 51-52). Given the close proximity between these locations, and the fact that the security footage shows the Defendant leaving the Crafty Jackalope after the altercation with M.O. at 11:13 p.m., the neighbors' statements placing Defendant's motorcycle at M.O.' home "around 11:30 p.m." or "after 11:00 p.m. but before 11:30 p.m." can fit either narrative. Even M.O.'s daughter's statement that she heard pounding at the front door at 12:30 a.m. cannot be completely discounted, (*See* Docket No. 140 at Gov't Ex. F), as it is entirely possible that Defendant went to the residence more than once on the night in question. However, the Court need not definitively resolve the question of whether Defendant went to M.O.'s residence before or after making the threatening phone calls, as it finds that the totality of Defendant's conduct on the night in question is sufficient to apply the enhancement regardless of the chronology of events.

Defendant admits that he sent the text message threatening M.O. if she was "with another dude" at 10:19 p.m. (*See* Docket Nos. 155 at 48-49; 140 at Gov't Ex. H). From his own recollection, he arrived at M.O.'s home a few minutes before 11:00 p.m. (Docket No 155 at 50). He knew her children lived at the residence, but did not know whether they were home at that time. (*Id.* at 19-20, 51). He was barred from the premises under the PFA. (Docket No. 140 at Gov't Ex. C). Nonetheless, when Defendant arrived at the home, he kicked in two windows and a screen door, knocked over a potted plant, and broke a security sign. (Docket No. 155 at 51). He then

8

proceeded to the Crafty Jackalope, because he "knew she [M.O.] was there." (*Id.* at 53). He went to the bar with the purpose of confronting M.O. (*See id.*). An argument ensued, and he admits that he took the glasses from her face and "slammed" them to the ground. (*Id.* at 55; Docket No. 140 at Gov't Ex. I).

Even under Defendant's chronology of events, his violent conduct followed the first threat he sent to M.O. via text message. (*See* Docket No. 140 at Gov't Ex. H). Further, his telephone threats were made within a half hour, at most, after destroying the victim's property at her home, and within twenty minutes of joining her at the Crafty Jackalope, getting into an argument, and taking the glasses from her face. (Docket No. 140 at Gov't Exs. H, I).

The commentary to the guidelines make clear that the Court may consider the totality of the Defendant's conduct,[2] both prior to and during the threats, so long as that conduct is "substantially and directly connected to the offense, under the facts of the case taken as a whole." U.S.S.G. 2A6.1, n.1. The prevailing caselaw in our Circuit also supports the application of the enhancement here.

To that end, in *Green*, the defendant instructed another individual to leave a voicemail threat for a U.S. Postal Service Inspector who was investigating him for fraud. 25 F.3d at 207-08. The threat was the following:

> Yeah, [Inspector] Bannan you better cut it the fuck out. I know where you live at motherfucker. Your family is in jeopardy, you better cut it out, or you're going to start a war you can't handle. I'm going to blow up that goddamn blue ass Camaro of yours, your [sic] better cut it the fuck out now. I'm coming for your family motherfucker.

---

[2] During the evidentiary hearing, counsel for the Defendant agreed that the Court may consider conduct which precedes the threat when deciding the applicability of the enhancement. (Docket No. 154 at 34).

9

*Id.* at 207. After being convicted of threatening a federal law enforcement officer, the defendant objected to the application of the 6-level enhancement under Guideline § 2A6.1(b)(1). *Id.* at 210-11. The Court of Appeals upheld the District Court's finding that the enhancement applied based on evidence that three days after the threat was made, the defendant had asked a friend who was a police officer to run a license plate check on the Inspector's car in an effort to obtain his address. *Id.*

More recently, in *Brodie*, the defendant sent an email threat to a New Jersey Congressman attaching a Google Earth image pinpointing the Congressman's New Jersey office. 824 F. App'x at 121. The Court of Appeals upheld the application of the enhancement upon finding that intent to carry out the threat was sufficiently established in the e-mail itself and that forwarding the Google Earth image showed "action beyond a mere internet search for the address of someone's office location." *Id*. The Court of Appeals also pointed to Defendant's possession of firearms and additional evidence supporting the application of the enhancement. *Id.* at 121-22.

After considering all of the evidence, the Court holds that the Government has met its burden to show by a preponderance of the evidence that Defendant engaged in an overt act sufficient to establish his intent to carry out the threats given the close temporal proximity between Defendant's actions and the threats he made to M.O. and her family. *See Green*, 25 F.3d at 211. To that end, the evidence shows that Defendant made repeated contacts to M.O. in an effort to find her location and traveled to both her home and a bar where she was out with a friend. (See Docket No. 140 at Gov't Exs. F-I). He acted violently at both locations as he admits that he damaged M.O.'s residence, which she shared with her children. He then engaged in a verbal confrontation with M.O. outside the bar which ended with him taking her glasses from her face and throwing them onto the street. While Defendant suggests that he left the area and therefore did have the

requisite intent to carry out the threats he made less than 30 minutes later, the serious nature of his actions give rise to an inference that he more likely than not had the intent to carry out his threats against M.O. and her family. *See Brodie*, 824 F. App'x. at 121-122 (Possessing firearms and sending a satellite image of the victim's office location and its surroundings, among other things, was sufficient evidence of intent to carry out a threat); *see also Green*, 25 F.3d at 211 (asking a friend to run the victim's license plate was sufficient overt act from which intent to carry out the threat could be inferred). Hence, the Government has established the applicability of the challenged enhancement by a preponderance of the evidence.

## V.  CONCLUSION

For all of these reasons, the Court finds that the six-level enhancement under Sentencing Guideline § 2A6.1(b)(1) applies in the present case, and it will consider the same in calculating Defendant's sentencing guidelines in its Tentative Findings and Rulings, which will be issued separately.

*s/Nora Barry Fischer*
Nora Barry Fischer
Senior United States District Judge

Dated: March 25, 2022
cc/ecf: All counsel of record